## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **MEMORANDUM DECISION AND ORDER** |
| **Plaintiff,** | |
| **vs.** | **Case No. 2:19-CR-00348-DAK** |
| **MARYSOL PENA-ARMENTA and JESUS NOEL RAMOS QUINTERO,** | **Judge Dale A. Kimball** |
| **Defendants**. | |

### INTRODUCTION

This matter is before the court on several motions from Defendant Jesus Noel Ramos Quintero ("Quintero") and Defendant Marysol Pena-Armenta[1] ("Pena-Armenta") (collectively "Defendants"): Defendant Quintero's Motion to Dismiss (ECF No. 60); Defendant Quintero's Motion to Suppress Statements and Evidence Derived as a Result of Violations of Sixth and Fifth Amendment Rights (ECF No. 61); Defendant Quintero's Motion to Suppress Evidence Derived as a Result of an Unlawful Search and Seizure (ECF No. 62); Defendant Pena-Armenta's Motion to Suppress Evidence Derived as a Result of an Invalid Search and Seizure (ECF No. 52); Defendant Pena-Armenta's Motion to Suppress Statements Derived in Violation of the Sixth and Fifth Amendment Rights (ECF No. 53); and Defendant Pena-Armenta's Motion

---

[1] Defendant Pena-Armenta filed her Motion to Sever (ECF No. 54) along with her other motions. It appeared as though the Motion to Sever was to be addressed along with the rest of the motions before the court at this time. But, the parties failed to argue or brief the Motion to Sever. Thus, the court will not be ruling on the Motion to Sever at this time. The parties may address the Motion to Sever to the extent necessary after the court issues this Memorandum Decision and Order.

to Dismiss for Outrageous Government Conduct or in the Alternative to Suppress Statements

(ECF No. 55.) On November 4, 2020, the court held an evidentiary hearing on these motions. At

the evidentiary hearing, Kelsy B. Young represented the United States, Erlinda O. Johnson and

Alexander Ramos represented Pena-Armenta, and Brett R. Parkinson represented Quintero. At

the close of the evidentiary hearing, the court directed the parties to file simultaneous briefs by

November 25, 2020. All parties timely filed their briefs. On December 2, 2020, the court held

closing arguments on these motions and took the matter under advisement. After carefully

considering the memoranda and other materials submitted by the parties and the facts and law

relevant to these motions, the court enters the following Memorandum Decision and Order.

**FINDINGS OF FACT**

### *Motel Surveillance*

On August 1, 2019, officers with the Utah County Major Crimes Task Force in Provo,

Utah, were conducting surveillance at the Little Suites Inn. (Ev. Hrg. Tr. at 8–9) [hereinafter Tr.]

During the surveillance, Officer Uipi was located in a parking lot across a four-lane road to the

east of the motel. (*Id.* at 13.) Other officers were located in a parking lot across a two-lane road

to the south. (*Id.*)

At some time in the late afternoon, the officers observed Defendants and one other

individual leaving room 204. (*Id.* at 14, 43.) Defendant Quintero was carrying a "colorful bag."

(*Id.*) According to Uipi, the three individuals were talking with each other "like something had

gone wrong or something was wrong by the way they were animatedly talking to each other."

(*Id.* at 18.) As the three individuals crossed the parking lot, they approached two vehicles, a

BMW and a Ford. (*Id.* at 17–18, 21.) One of the Defendants placed the colorful bag into the

trunk of the BMW. (*Id.* at 18.) After one of the Defendants placed the bag into the BMW, Pena-

2

Armenta and the third individual got into the BMW and Quintero got into the Ford. (*Id.* at 22.)
Both cars then drove to a Home Depot parking lot less than one minute away. (*Id.* at 19.) Some
of the surveilling officers followed. (*Id.* at 19.)

At the Home Depot parking lot, the two vehicles did not move or meet with anyone. (*Id.*
at 46.) While Defendants were parked at Home Depot lot, the officers at the motel observed
emergency medical services ("EMS") and a uniformed police officer arrive at the motel and
proceed to room 204—the room Defendants left just moments earlier. (*Id.* at 23.) At some point
before interacting with Defendants, the surveilling officers discovered that the EMS responded to
room 204 due to a drug overdose. (*Id.*) The EMS successfully treated the overdose and
transported the individual to the hospital. (*Id.* at 24.)

Shortly after EMS transported the overdosed patient to the hospital, Defendants and the
other individual returned to the motel parking lot in the Ford—leaving the BMW at Home Depot.
(*Id.* at 24.) After talking for a short time in the motel parking lot, the three individuals returned to
the Home Depot to retrieve the BMW and return it to the motel. (*Id.*) Once the two cars were
parked side by side in the motel parking lot, Pena-Armenta moved the colorful bag from the
BMW to the Ford. (*Id.* at 24–25.) As Pena-Armenta moved the bag, Officer Uipi testified that
Defendants were looking around "suspiciously." (*Id.*) After the bag was moved into the Ford,
Defendants and the third individual got into the BMW and left the motel parking lot. (*Id.* at 25–
26.) Quintero was driving, Pena-Armenta was seated in the back seat on the passenger side, and
the third individual was in the front passenger seat. (*Id.* at 27.)

### ***Stopping the BMW & Calling for the K-9***

Defendants were not able to drive more than a few hundred yards north before the
undercover officers pulled over the BMW. (*Id.* at 26, 43, 59–60.) Officer Uipi testified that the

reason for the stop was an inoperable taillight. (*Id.* at 26, 70.) In fact, on August 5, 2019, Officer Uipi wrote in his report that the inoperable taillight was the reason for the stop. (*Id.* at 70.) At the evidentiary hearing, however, it was clearly established that the taillight was, in fact, operable. (*Id.* at 49–50, 141–42.) Officer Uipi's report does not list any other reason for the stop. (*Id.* at 70.)

Up to this point, the timeline is clear and the facts are relatively undisputed. It is at this point, however, that the timeline becomes unclear and the parties have major disputes over the facts. With that in mind, the court finds that it must rely only upon Officer Uipi's testimony as supported by the body camera videos because Officer Uipi's testimony is inconsistent and unclear about the timeline. Additionally, the court will be relying on modified versions of the timestamps contained in the body camera footage admitted as Exhibits F and K during the evidentiary hearing. These timestamps confusingly display the date and time as, for example, "2019-08-02 T04:45:57z." (*See* Ex. F at 00:14, Ev. Hrg, Nov.4, 2020; *see also* Ev. Hrg., Ex. K, Nov. 4, 2020) [hereinafter Ex. F and Ex. K]. The court was initially inclined to completely disregard these timestamps as unreliable since they seem to indicate the wrong day at 4:45 in the morning. However, upon the court's review of the body camera footage, it appears that just the date and hour are incorrect. (Ex. F at 00:14.) At 14 seconds into the video contained in Exhibit F, the squad car's center console time is visible, showing 10:44—just one minute behind the timestamp. (*Id.*) Thus, the court finds that the timestamp is reasonably reliable if modified to reflect the accurate hour and date. Accordingly, the court will treat the timestep "T04:45:00" as meaning 10:45 p.m., "T05:00:00" as 11:00 p.m., and so on. Lastly, since the timestamps are in sync between both body cameras, the court will treat Exhibit K's timestamp in the same manner.

With the issue of the timestamps cleared up, the court can now make factual findings about the timeline of events after Defendants left the motel in the BMW. Of the most concern are the inconsistencies about when the stop happened and how long after the stop that the K-9 unit arrived. Officer Uipi's testimony on these matters is anything but clear or consistent.

Turning to what time the officers stopped Defendants, Officer Uipi was very adamant and confident that the officers initiated the stop around 9:40 p.m. (Tr. at 42–43.) The court finds it helpful to quote this portion of the transcript where Ms. Johnson asks Officer Uipi about the time of the stop. Referring to Officer Uipi's police report,[2] Ms. Johnson asks:

> Q. And in the first paragraph, about seven lines down, you indicated about 9:40 p.m. detectives observed individuals exiting room 204. Do you disagree with that, sir?
> A. I would say that wouldn't be the first. We had observed him prior to that.
> Q. But you would agree with me that nowhere in your report do you indicate that, prior to 9:40 p.m., you first observed Mr. Ramos Quintero?
> A. Yes. It must have been a typo.
> Q. So the question, Detective, would be, is that you first observed activity in room 204 coming in and out of room 204 about 9:40 p.m.?
> A. No. That—9:40 p.m. was around the time we were at—doing the traffic stop.
> Q. 9:40 p.m. was the time you were doing the traffic stop, is that your testimony?
> A. Yeah. That would have been around the time we were doing the traffic stop. It was more towards the night.

(Tr. at 42.) Officer Uipi unequivocally and confidently testified that his report contained a typo and the stop began around 9:40 p.m. despite what is indicated in his police report.[3] (*Id.*) This one

---

[2] The parties did not admit the police report into evidence. So, the only knowledge the court has regarding the report is what the parties referenced during the evidentiary hearing.

[3] The court does not afford much weight to Officer Uipi's police report because it is proving to be unreliable. First, Officer Uipi states that his own police report contains a critical typo about the time that the traffic stop occurred and when he first observed Quintero on the night in question (Tr. at 59.) Second, the police report omits the entirety of the "culmination of what [the officers] observed" that night to justify the traffic stop. (Tr. at 47.) Instead, the report merely lists the clearly debunked inoperable taillight as the sole reason for the stop. (Tr. at 47, 70.)

assertion that the stop happened at 9:40 conflicts with three other portions of his testimony. That is not to say that those other times are consistent either.

Just a few minutes after establishing the time of the stop, Officer Uipi agreed with Ms. Johnson that "it would be fair to say that [the stop] had been ongoing for about ten minutes" when a uniformed officer wearing a body camera showed up to help with the stop. (Tr. at 52.) The video recorded from this officer's body camera was admitted as Exhibit F during the evidentiary hearing. (*Id.*) This officer arrived around 10:45, meaning that the stop would have occurred around 10:35. (Ex. F. at 00:01.) Earlier in his testimony, however, Officer Uipi stated that he called for the dog "two to three minutes" into the stop "and the K-9 responded from Orem. To get from Orem to Provo, approximately it takes about . . . 8 to 10 minutes to arrive on scene." (Tr. at 32.) Working backward from when the dog arrived and according to this version of Officer Uipi's testimony, the stop would have occurred around 10:45 p.m. (Ex. K at 00:02.)

At the very end of his testimony, Officer Uipi gives yet another time for when the stop occurred. Within this portion of Officer Uipi's testimony, he not only is inconsistent about the time the stop occurred but also about what is contained in the "CAD log."[4] On redirect examination by Ms. Young, Officer Uipi testified as follows:

> Ms. Young:    Do you have a document that says when this traffic stop occurred?
> The Witness:  I do.
> Ms. Young:    What is that document?
> The Witness:  It's, again, the CAD call.
> ***
> The Court:    Is [the time of the stop] reflected on the CAD when it started?
> The Witness:  Yes.
> The Court:    And what time is that?
> The Witness:  So, Detective Shepherd called it out on 10:41.
> ***

---

[4] CAD stands for "computer-aided dispatch."

| | |
|---|---|
| Ms. Young: | Okay. . .  I want to be very clear when the traffic stop occurred. So, Detective Shepherd conducts the traffic stop for the taillight; is that correct, Detective Uipi? |
| The Witness: | Yes. |
| Ms. Young: | What time does that occur? |
| The Witness: | That I don't know, other than what the CAD call says. |
| Ms. Young: | Well, is that the CAD call reading that the traffic stop occurred at 10:41? |
| The Witness: | That's what I have on the CAD [call]. |

(Tr. at 77–78.) Ms. Young concludes this line of questioning with quite the understatement: "I think there is some confusion" about the time of the stop. (Tr. at 79.) Despite the confusion, this testimony seems to—at first blush—establish the time of the stop as 10:41. But, on recross examination, defense counsel asks whether the "CAD report actually just references the dispatch of the K-9, doesn't it." (Tr. at 83.) Officer Uipi responds, "Yes, and when—and other things." (Tr. at 83.)

To summarize, Officer Uipi testified that the stop occurred at 9:40, 10:35, 10:41, and 10:45. The court is not so troubled by the 10-minute difference between the 10:35 and the 10:45 times. Indeed, a ten-minute change is not likely of consequence in this Fourth Amendment analysis. What is troubling to the court, however, is Officer Uipi's inconsistent testimony about what the CAD log shows and when the stop occurred. To only further complicate this matter, Plaintiff did not produce the CAD log, call any of the other officers to testify and corroborate Officer Uipi's timelines, or admit into evidence Officer Uipi's police report. Thus, the court is left only with the testimony described above.

According to Officer Uipi's testimony, the court makes a few findings. First, the court finds that the CAD log only reflected that the call for the K-9 unit went out at 10:41 and the K-9 unit informed Officer Uipi that it was on its way to the stop at 10:44. (Tr. at 58–60.) Thus, the CAD log did not show the time the stop occurred and, therefore, the stop could not have

occurred at 10:41. Second, since the court finds that the 10:41 time cannot be accurate, the stop also could not have occurred at 10:45.

Lastly, the court finds that the stop occurred around 9:40. The court makes this finding based on the following reasons. First, Officer Uipi was confident that the stop was ongoing at 9:40 and that his police report contained a typo about when they first observed Quintero at the motel. Officer Uipi even gave details about why the report must be wrong, stating that "it was still during the day time" when they first observed Quintero at the motel and, therefore, the 9:40 time given in the police report is wrong. (*Id.*) Second, because Officer Uipi's testimony was so inconsistent, the court finds that much of his testimony was self-serving. That is to say, Officer Uipi appeared to testify to the facts as he thought would best serve the Plaintiff. Accordingly, the court finds that Officer Uipi's explanations that the stop occurred closer to the time that he called for the K-9 unit were simply attempts to make the detention sound more reasonable.

### *The K-9 Unit's Arrival & Running the Dog*

Thankfully the court can more easily determine what time the K-9 unit was called and arrived. Officer Uipi was slightly more consistent on this topic. Under cross-examination, Ms. Johnson asks Officer Uipi if he "would disagree if the records reflect that the K-9 unit arrived about 10:44, 10:45 in the evening?" (Tr. at 58.) Officer Uipi then refreshes his memory by looking at the CAD log on his cell phone and responds: "So the CAD call shows that the—we requested the K-9 around 10:41. Around 10:44 the K-9 unit said they are en route." (Tr. at 58–60.) This timeline is supported by the timestamps in Exhibits K and F, both showing the dog arriving around 10:57 (Ex. F at 02:05; Ex. K at 11:42.) The 10:44 en route time and the 10:57 arrival time are also roughly corroborated by Officer Uipi's earlier testimony that it takes about eight to ten minutes for the K-9 unit to respond from Orem to Provo. (Tr. at 32.)  Accordingly,

the court finds that the call for the K-9 unit went out at 10:41 and the K-9 unit arrived around 10:57.

When the K-9 officer approached Quintero in the driver's seat, the K-9 officer said, in English: "Hey bro, they asked me to come run my dogs, so can you do me a favor and roll up your window for me so he doesn't come in?" (Ex. K at 2:03–02:10.) Another officer then said, "Spanish"—indicating to the K-9 officer that Quintero does not speak English. (Ex. K at 02:09–02:12.) An officer then ordered Quintero out of the car, the instruction to roll up the window was not repeated in Spanish, and the front driver's and passenger side windows were left down. (Ex. K at 02:09–02:25.)

At 10:59 p.m., the K-9 officer began the perimeter smell of the BMW. (Ex. F at 13:23.) The K-9 officer stood at the front of the vehicle and gave the dog the signal to start sniffing. (*Id.*) The dog began the perimeter smell working its way from the front of the vehicle's driver's side, around the rear of the vehicle, with the K-9 officer giving the dog the entire length of the leash. (*Id.* at 13:23–13:30.) As the dog worked its way from the back of the car to the front on the passenger side, it briefly passed the open passenger window, stopped, and then doubled back and sniffed the seam between the front and rear passenger doors of the BMW. (*Id.* at 13:30–13:40.) As the dog doubled back, the K-9 officer continued walking toward the front of the BMW and stepped over the dog's hind legs. (*Id.*) After he stepped over the dog's hind legs, the K-9 officer was then situated near the front tire as the dog placed its front paws in the open passenger window. (*Id.*) The officer never appeared to stop walking around the vehicle until the dog attempted to enter the passenger window. (*Id.*) Simultaneously with the dog's entry into the car, however, the K-9 officer stepped toward the open window and appeared to feed the leash into the car. (*Id.*) The officer did not attempt to prevent the dog from entering the vehicle. (*Id.*) The dog

remained inside the BMW for approximately 40 seconds. (*Id.* at 13:35–14:20.) While inside the vehicle, the dog indicated that it smelled drugs. The officers then searched the car and found the keys to the Ford and Pena-Armenta's cell phone. (Tr. at 37–38.) No drugs were found in the BMW. (*Id.*)

### *The Investigation: Before, During, & After the K-9 Unit*

Since the surveilling officers were undercover, they do not have cameras in their vehicles or on their bodies. (Tr. at 56.) So, the beginning of the traffic stop is not captured on video or audio. (*Id.*) Without any video evidence, there is a dearth of information about what happens during the first 65 minutes of the stop. (*See* Tr. at 6–83; *see also* Ex. K; Ex. F.) The only evidence the court has regarding this time is Officer Uipi's testimony—which is anything but detailed regarding the timeline. In fact, the court can only make two findings about what occurred during those first 65 minutes. First, the officers removed a bottle of alcohol from the car and placed it on the roof of the BMW. (Ex. F at 00:40–01:35.) Second, the officers removed Pena-Armenta from the back seat and began asking her questions. (*Id.*) The court is only able to make these findings because of what is displayed in the earliest-responding, uniformed officer's body camera footage. (*Id.*)

From the body camera video and Officer Uipi's testimony, the court notes six relevant events that occurred during the stop. The court keys in on these six events after meticulously comparing Officer Uipi's testimony with the videos in Exhibits K and L. These events are as follows:

First, the officers discovered open containers of alcohol. As noted earlier, the alcohol was discovered early in the stop. According to the body camera video, when the first officer equipped with a camera arrives, an open container of alcohol is seen on the roof of the car (Ex. F at 0:40)

10

and Pena-Armenta has already been removed from the back seat. (Ex. F at 00:44–01:35.) At 10:53, the passenger shows an officer a second bottle of alcohol, and the passenger is removed from the car. (Ex F. at 07:18–07:38.) At that point, the officers only briefly inquired about whether Quintero had been drinking or was intoxicated. (*Id.* at 00:40–7:38). It isn't until 11:35 p.m. that an officer administers a field sobriety test to Quintero. (Ex. K at 39:50–44:02.) The officer who administered the test concluded: "I don't think he is impaired." (*Id.* at 44:30–44:32.)

Second, Officer Uipi obtained Quintero's drivers' license and some other paperwork. (Tr. at 28.) This must have occurred before the K-9 arrived, but there is no conclusive evidence about the precise time.

Third, Officer Uipi attempted to identify Pena-Armenta but she gave a false name. (Tr. at 29.) The officers eventually learn that she gave a false name at 12:45 a.m., just before they place Defendants under arrest. (Ex. F at 1:59:31–2:00:08.)

Fourth, after the K-9 arrived, the officers separated each of the BMW's occupants to begin questioning about what had happened to the person who overdosed in room 204. (Tr. at 29–30.) Upon questioning, Defendants and the third individual allegedly gave inconsistent stories about why they were in Provo. (Tr. at 75–76.) The officers do not hear these inconsistent stories until after the officers separated the three individuals, which separation occurred after the K-9 arrived at 10:57 p.m. (Ex. K at 02:09–02:25.) Additionally, under cross-examination, Officer Uipi conceded that the three individuals' accounts were not all that inconsistent. (Tr. at 56–58.) Thus, the court will afford these inconsistencies their due weight when it makes legal findings below.

Fifth, Officer Uipi testified that after he separated the occupants, he interviewed Pena Armenta. (Tr. at 33.) As he interviewed her, "she was messing with her phone. . . she was taking

the SIM card out from—the cell phone, and she attempted to throw it underneath the BMW."
(Tr. at 33–34.) This event, however, appears to happen long into the stop. It certainly could not
have happened until after the officers searched the BMW because the officers find Pena-
Armenta's cell phone during the search. (Tr. at 37–38.) Additionally, Exhibit K appears to show
this event occurred after midnight.

At 12:16 a.m., Officer Uipi is seen getting into his patrol car and then hands Pena-
Armenta a cell phone. (Ex. K at 1:21:50.) At 12:35 a.m., Pena-Armenta can be seen messing
with her phone before she bends over and appears to toss something to the ground. (Ex F. at
1:49:16–54.) Although the audio quality is not ideal, and the background noise is significant, it
sounds to the court that an officer asked "why are you trying to get rid of your SIM card?" (Ex F.
at 1:49:58–1:50:02.) Officer Uipi signaled for Pena-Armenta to step back. (*Id.* at 1:50:10–
1:50:20.) Officer Uipi then appears to pick something up from the ground near the front tire of
his patrol car. (*Id.*) The court, therefore, finds that this is the event about which Officer Uipi
testified. Accordingly, Pena-Armenta did, in fact, try to dispose of the SIM card, but this
occurred at Officer Uipi's car (not the BMW) at 12:35 a.m.—nearly three hours after the stop
and one and a half hours after the K-9 alerted in the BMW.

Sixth, and finally, as the officers questioned Defendants, the K-9 unit left the scene of the
stop, traveled to the motel, and the dog alerted on the Ford. (Tr. at 30–32.) After the dog alerted
on the Ford, the officers obtained a warrant and discovered that the colorful bag contained 3.5
lbs. of heroin. (Tr. at 30–32.) Defendants were then placed under arrest.

### *The Charges & The Transport to Initial Appearance*

Pena-Armenta was initially charged in the Fourth Judicial District Court in Utah County.
(Tr. at 120–21.) On September 12, 2019, a federal grand jury sitting in the District of Utah,

Central division returned an indictment charging Pena-Armenta with Possession with Intent to Distribute. (Tr. at 121–22.) During her state case, attorney Mari Alvarado-Tsosie represented Pena-Armenta. (Tr. at 120–21.) Ms. Alvarado-Tsosie also represented Pena-Armenta, albeit briefly, in this federal case, entering her appearance on September 26, 2019. (Tr. at 122–23.) Lastly, Federal Bureau of Investigation (FBI) Agent Larson was also involved in both the state and federal cases. (Tr. at 94, 96.)

On September 26, 2019, FBI Agent Larson transported Pena-Armenta and Quintero to the U.S. District Court for their initial appearances. (Tr. at 98.) Agent Larson captured an audio recording of the transport. The transcription and translation of Agent Larson's conversation with Defendants was admitted as Exhibit G-1 during the evidentiary hearing (Ev. Hrg., Ex. G-1, Nov. 4, 2020) [hereinafter Ex. G-1].

Agent Larson first picks up Quintero and reads him his *Miranda* rights in Spanish. (Evi. Hrg., Ex. G at 13:00–14:35) [hereinafter Ex. G]. Then, after picking up Pena-Armenta, Agent Larson tells Defendants where they are heading and recites the *Miranda* warnings to Pena-Armenta in English. (Ex. G-1 at 2–3.) The court finds it is best to quote the *Miranda* warning:

> U-hm and you have all the same rights you had in your state case, right. . . You have the right to remain silent. . . Anything you say could be used against you in court. . . You have the right to, ah, be represented by an attorney. . . If, ah, you can't afford an attorney, one will be provided for you by the court.

(*Id.* at 2, lines 18–26.) As Agent Larson recites the *Miranda* warnings to Pena-Armenta, she translates some of those warnings for Quintero. (*Id.*) A short while later, Agent Larson asks Pena-Armenta: "Do you have any questions about what your rights are? So, you understand. You've been through this before?" (*Id.* at 3, line 56.) Pena-Armenta responds: "Not at all." (*Id.* at 3, line 57.) Listening to the audio during this exchange shows that Pena-Armenta's response was

to Agent Larson's second question, regarding whether she had been through this before. (Ex G. at 49:37–49:50.)

Right after Agent Larson says that the court may provide Defendants an attorney, Pena-Armenta states: "If we already have an attorney, it's [inaudible] to you." (Ex G-1 at 2, line 27.) Agent Larson responds by stating that she might need a new attorney, different than her attorney in the state case—implicitly acknowledging she was represented in the state matter. (*Id.* at 2, lines 29–42.) Pena-Armenta then unequivocally indicates that she has an attorney: "So, *the one that I have already* that [inaudible] for federal, um she's not good, at all." (*Id.* at 2, line 43 (emphasis added).)

After being made aware that Pena-Armenta was represented by counsel, Agent Larson did not passively field Pena-Armenta's questions. For example, contrary to Plaintiff's position, Agent Larson brings up the topic of Pena-Armenta cooperating with the government to resolve her case. (*Id.* at 3, line 44.) Pena-Armenta then asks "[w]hat does it mean cooperate with the case, or the whole thing, . . . what do you mean?" (*Id.* at 3, line 63.) What follows is a lengthy back and forth between Agent Larson and Pena-Armenta about what it means to cooperate, his advice on how she can and should cooperate, and then he steers the conversation into details about Pena-Armenta's case. (*Id.* at 3–12.) During this back and forth, Agent Larson asks: "So, are you guys saying it's, the guy who overdosed it's primarily his heroin. Is that the . . . is that what we are really talking about?" (*Id.* at 6, line 104.) Agent Larson and Pena-Armenta then discuss more of the specifics of her situation and Agent Larson continues to give his take on the facts of her case and provides unprovoked advice about how Pena-Armenta can and should cooperate with the government. (*Id.* at 6–10.)

Agent Larson's questions and statements, in the court's opinion, were intended to try and goad Pena-Armenta into talking about her criminal history, this case, or similar matters. For example, Agent Larson: (1) continues to accuse Pena-Armenta of being untruthful, urging her to be open and honest (*Id.* at 10, lines 176–96); (2) makes passive-aggressive comments to Pena-Armenta (*Id.* at 6–7, line 123; 15, line 298; 17, lines 328–357); and (3) continually implies that Pena-Armenta and Quintero are long-time or career drug dealers working for the cartel (*Id.* at 19, lines 408–22; 21, line 459; 23, lines 525–44; 24–25, lines 597–603.) In short, when viewing the conversation during the transportation as a whole, the court to find that Agent Larson was not merely a passive participant in the conversation. Rather, Agent Larson was trying to get some kind of rise out of or information from Pena-Armenta.

Upon arriving at the courthouse, Pena-Armenta terminated Ms. Alvarado-Tsosie as her lawyer. (Tr. at 124, 129.) Pena-Armenta told Ms. Alvarado-Tsosie that she did not need her anymore because she could speak with the government herself. (Tr. at 124, 127.) Prior to being terminated, Ms. Alvarado-Tsotsi believed she had a good attorney-client relationship with Pena-Armenta and was surprised by Pena-Armenta's actions. (Tr. at 124–28.)

### CONCLUSIONS OF LAW

Defendants argue the officers violated their Fourth, Fifth, and Sixth Amendment rights. The court will address each of these arguments in turn.

## I.    **Fourth Amendment**

The Fourth Amendment protects against unreasonable searches and seizures. *See* U.S. Const. Amend. IV. "[T]he underlying command of the Fourth Amendment is always that searches and seizures be reasonable." *Wilson v. Arkansas*, 514 U.S. 927, 931 (1995) (citation omitted). In a motion to suppress, "[t]he government has the burden of demonstrating that the

seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." *United States v. Perdue,* 8 F.3d 1455, 1462 (10th Cir.1993).

Defendants allege their Fourth Amendment rights were violated because the officers did not have: (A) reasonable suspicion to stop the BMW; (B) reasonable suspicion to prolong the stop; or (C) probable cause to search the BMW without a warrant. Defendants argue that if any one of these events violates the Fourth Amendment that the court must suppress all evidence discovered as a result of the invalid search or seizure pursuant to the exclusionary rule.

### A. Reasonable Suspicion for a *Terry* Stop

The constitutionality of a traffic stop is analyzed under the *Terry v. Ohio* reasonable suspicion standard for investigatory detentions. *United States v. Winder*, 557 F.3d 1129, 1133 (10th Cir. 2009) (citing *Terry v. Ohio*, 392 U.S. 1, 27 (1969)). Under this standard, for a traffic stop to pass constitutional muster it must be "justified at its inception" and "reasonably related in scope to the circumstances which justified the interference in the first place." *United States v. Shareef*, 100 F.3d 1491, 1500 (10th Cir. 1996) (citation omitted). For an investigatory stop to be justified at its inception, courts

> ask whether the circumstances demonstrate that the law enforcement officers had reasonable suspicion that criminal activity may have been afoot. In making this determination, [courts] look at the totality of the circumstances to determine whether a particularized and objective basis, viewed from the standpoint of an objectively reasonable police officer, existed for suspecting criminal wrongdoing.

*United States v. Lopez*, 518 F.3d 790, 797 (10th Cir. 2008) (citations omitted). This reasonable suspicion standard is purposely "somewhat abstract" and courts have "deliberately avoided reducing it to a neat set of legal rules" *United States v. Arvizu*, 534 U.S. 266, 274 (2002) (citations omitted). Although this abstract standard is not difficult to meet, "an officer's reliance

on a mere hunch is insufficient to justify a stop." *Id.* (citation omitted). In short, under the objective standard courts should "ask whether the facts available to the detaining officer, at the time, warranted an officer of reasonable caution in believing the action taken was appropriate." *United States v. McHugh*, 639 F.3d 1250, 1256 (10th Cir. 2011).

In this case, Defendants spend the majority of their time arguing that there was no reasonable suspicion to stop Defendants' vehicle based on an inoperable taillight. The court would have no problem finding a Fourth Amendment violation were the taillight the only reason for the stop. The taillight, however, is not the only basis for the stop—and Plaintiff has distanced itself from the taillight argument.[5]

Under Tenth Circuit case law, Plaintiff may abandon the pretextual justification of the taillight as the basis for the stop and argue the totality of the circumstances justified the detention. *See United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995). Plaintiff may engage in such *post hoc* justification of the stop because, in examining the constitutionality of a traffic stop, it is "irrelevant that the officer may have had other subjective motives for stopping the vehicle. [The] sole inquiry is whether this particular officer had reasonable suspicion" that criminal activity may have been afoot. *Id.*; *see also Lopez*, 518 F.3d at 797 (articulating that an investigatory stop may be justified when an officer suspects criminal activity). The Tenth Circuit adopted this standard because it "properly focuses on the very narrow question of whether the initial stop of the vehicle is objectively justified." *Botero-Ospina*, 71 F.3d at 788. Thus, the court proceeds under the proper standard by examining what facts were available to the detaining officers when they pulled over Defendants and whether those facts objectively support a finding

---

[5] The court does wish to express its concern over the pretext of the inoperable tail light listed in Detective Uipi's police report. This fabrication only works to complicate Plaintiff's case by calling into question the officer's credibility and the accuracy of their reports and testimony.

of reasonable suspicion. The court finds that the facts available to the detaining officers did, in fact, satisfy the reasonable suspicion requirements.

In this case, Defendants' actions are very unusual and suspicious. The officers observed Defendants and one other person leave room 204 talking in an animated fashion and carrying a colorful bag. Defendants placed the bag into the BMW and drove the BMW and a Ford to a nearby Home Depot parking lot. While in the Home Depot parking lot, Defendants did not meet anyone or go into the store. Also, while Defendants are in the nearby parking lot, EMS responded to a drug overdose at the room Defendants had left just a few minutes earlier. After EMS treated the individual and took him to the hospital, Defendants promptly returned to the motel parking lot in just the Ford. Defendants then drove back to the Home Depot parking lot, retrieved the BMW, and again returned to the motel parking lot with both cars. In the motel parking lot, Defendants acted suspiciously as they again moved the bag from the BMW and into the Ford. Defendants then left the motel in the BMW.

Given these facts, the court finds that an officer would reasonably suspect some kind of drug-related activity was afoot. Defendants unsuccessfully attempt to paint many of these activities as typical behavior for people staying at a motel (*e.g.*, carrying bags at a motel, talking in an animated fashion, placing bags into cars, driving to a nearby store, etc.) The court agrees that, examined individually, many of these actions are entirely innocent behaviors. The court, however, must look to the totality of the circumstances. In so doing, the court cannot ignore the glaring suspicious actions and circumstances. Defendants' actions in moving the bag back and forth from the BMW to the Ford and moving the cars between parking lots is undeniably suspicious behavior. These facts alone likely support a finding of reasonable suspicion. The moving of the bag and the cars when combined with the overdose in the room Defendants had

just left, however, easily provides the officers with enough reasonable suspicion to conduct an investigatory stop.

Thus, for the foregoing reasons, the court finds that the officers had reasonable suspicion that Defendants were engaged in drug-related activities sufficient to make an investigative stop.

**B. Reasonable Suspicion to Prolong the Stop**

Once an officer makes an investigative stop, the following detention "must be reasonably related in scope to the circumstances which justified the stop in the first place because the Fourth Amendment imposes limitations on both the length of the detention and the manner in which it is carried out." *United States v. Romero*, 743 F. Supp. 2d 1281, 1307 (D.N.M. 2010) (internal citations and quotation marks omitted), *aff'd*, 749 F.3d 900 (10th Cir. 2014). "Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's mission"—in this case, to address the suspicion of drug-related activity. *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (internal quotation marks and citation omitted). Thus, a stop "may last no longer than is necessary to effectuate that purpose. Authority for the seizure thus ends when the tasks tied to the [stop] are—or reasonably should have been—completed." *Id.* (internal citations and quotation marks omitted). Lastly, in assessing the length of the detention, "[courts] take into account whether the police diligently pursue their investigation." *United States v. Place*, 462 U.S. 696, 709 (1983). The questions for the court are, therefore, what tasks were to be performed during a stop for drug-related suspicions and how long should those tasks reasonably take?

Before addressing these questions, the court reiterates that it is the government's burden in demonstrating that the stop is constitutionally sound and that there is essentially zero evidence before the court regarding the first 65 minutes of the stop. *See United States v. Perdue,* 8 F.3d

1455, 1462 (10th Cir.1993) (establishing that the government bears the burden of proving constitutionality). Turning to the matter at hand, in *United States v. Mendoza*, the Tenth Circuit addressed the amount of time that an officer may reasonably detain an individual under an investigative stop while waiting for a K-9 unit to respond. 468 F.3d 1256 (10th Cir. 2006). In *Mendoza*, the officer stopped the defendant after he rolled through a stop sign. *Id.* at 1258. As the officer ordered the defendant to roll the windows down, the officer noticed a strong smell and strange placement of air fresheners in the car. *Id.* During the officer's initial exchange with the defendant, the defendant seemed nervous, changed his story about who owned the vehicle, and gave other suspicious or inconsistent answers to the officer's questions. *Id.* at 1258–59. After the officer confirmed the driver had a valid license and proper registration, he asked for permission to search the vehicle. *Id.* at 1259. The driver refused to consent to the search. *Id.* At that point, the officer informed the defendant that he was not free to leave until a K-9 unit could come to inspect the vehicle. *Id.* The officer then promptly called for a dog. *Id.* The K-9 unit, however, was 50 miles away and took 40 minutes to arrive. *Id.* When the dog arrived it alerted on the car and the subsequent search uncovered methamphetamine. *Id.* Before his trial, the defendant attempted to suppress the evidence uncovered by the search and the district court denied his motion. *Id.*

On appeal, the Tenth Circuit upheld the district court's ruling. The court held that the 40-minute detention did not need to be supported by probable cause.

> Officers with reasonable suspicion to believe that the occupants of a vehicle are engaged in the unlawful transportation of contraband may detain the vehicle for a reasonable time to obtain a properly trained dog to sniff for contraband. Given the distance between the scene of the detention and the nearest handler, as well as [the officer's] diligence in promptly calling the dog handler and the handler's speedy arrival, a 40–minute detention was reasonable.

*Id.* at 1261 (citation omitted). The *Mendoza* court also noted that detentions lasting 22 minutes and 38 minutes have been upheld as reasonable times waiting for a dog to arrive. *Id.* (citing *United States v. Santos*, 403 F.3d 1120 (10th Cir. 2005) and *United States v. Villa-Chaparro*, 115 F.3d 797 (10th Cir. 1997)).

The present case is distinguishable from *Mendoza* in two important ways. First, unlike *Mendoza*, the stop in this case was based upon the reasonable suspicion that Defendants were engaged in drug-related activity. With that being the purpose of the stop, the officers should have acted diligently to confirm or dispel those suspicions from the moment they stopped Defendants. With that in mind, this case differs in a second, critical way; the officers in this case did not promptly call for the K-9 unit. Here, the officers waited an hour before requesting a K-9 unit. Therefore, the officers did not "diligently pursue their investigation" into whether Defendants were engaged in drug-related activity. *See Place*, 462 U.S. at 709. Accordingly, the court finds the officers unreasonably prolonged the stop and violated Defendants' Fourth Amendment rights unless Plaintiff can show an additional, independent basis for prolonging the stop.

Plaintiff argues that, beyond the drug-related suspicions, the officers had six additional, independent bases upon which they could prolong the stop. Plaintiff argues that the officers lawfully prolonged the stop because: (1) they observed an open container in the car; (2) Pena-Armenta gave a false name when asked to identify herself; (3) the three individuals gave inconsistent stories about why they were in Provo, Utah; (4) the K-9 indicated inside the BMW; (5) Pena-Armenta attempted to get rid of the SIM card evidence; and (6) the K-9 indicated on the Ford, leading to the discovery that the colorful bag contained heroin. Unless Plaintiff can show that one or more of these facts supports a reasonable suspicion to prolong the detention, the court must find the detention unreasonable.

21

The court can easily disregard all but one of these arguments because they happened too long into the stop to support a reasonable suspicion to justify prolonging the detention. Specifically, only the open alcohol container could possibly support prolonging the stop because it is the only event that happened before the K-9 unit arrived and alerted inside the BMW.[6] Obviously an open alcohol container could, in some circumstances, support prolonging a stop. But, such determinations are made on a case-by-case basis. The issue here is again whether the officers "diligently pursue[d] their investigation." *Place*, 462 U.S. at 709. The court finds that the officers failed to do so. An officer does not diligently investigate or pursue an open alcohol container or possible driving while intoxicated violation by waiting two hours and 55 minutes before issuing a ticket for an open container (which never happened here) or administering a field sobriety test. (Ex. K at 39:50–44:02 (showing the field sobriety test being administered at 11:35).) Additionally, the field sobriety test occurred well after the K-9 alerted inside the BMW. Thus, the open container in this instance does not support a finding of reasonable suspicion to justify the prolonged detention because the officers did not diligently pursue an investigation of the open container.

For the foregoing reasons, the court finds that Plaintiff has not shown that the length of the detention was reasonable under the circumstances or that there was probable cause for a custodial detention. *See Rodriguez v. United States*, 575 U.S. 348, 354 (2015) ("Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." (citation omitted)). Accordingly, the court finds that the officers violated Defendants' Fourth Amendment rights.

---

[6] The court uses the K-9's alert inside the BMW as the cutoff time because the alert inside the MBW, if lawful, would support a detention until the K-9 had a chance to sniff the Ford.

### C. Probable Cause to Search the BMW

"The Fourth Amendment generally requires police to secure a warrant before conducting a search." *Maryland v. Dyson*, 527 U.S. 465, 466–67 (1999) (citation omitted). Without a warrant, a police officer must have probable cause to search a vehicle under the well-established automobile exception to the Fourth Amendment. *See Florida v. Harris*, 568 U.S. 237, 243 (2013). "A police officer has probable cause to conduct a search when the fact available to him would warrant a person of reasonable caution in the belief that contraband or evidence of a crime is present." *Id.* at 243 (internal quotation marks and citation omitted).

There are two separate issues for the court to decide on this matter. First, did the dog jumping into the interior of the BMW constitute a search under the Fourth Amendment and, therefore, require probable cause? If not, the dog's alerting inside the vehicle would certainly give the officers probable cause to search. Second, if the dog's entry into the car did require probable cause, did the officers have enough to meet that standard? The court will address each question in turn.

#### 1. Dog's Entry Into the BMW

"It is well settled that a drug dog's sniff of the outside of a car is not itself a search for Fourth Amendment purposes and so doesn't require a showing of probable cause to justify it." *United States v. Ludwig*, 641 F.3d 1243, 1250 (10th Cir. 2011) (citing *Illinois v. Caballes,* 543 U.S. 405, 409 (2005)). "It is equally well settled that a trooper's [interior inspection of a car's compartments] is a search and does require probable cause to make it constitutional." *Id.* "Officers may not, however, rely on a dog's alert *if they open part of the vehicle* so the dog can enter or *if they encourage the dog to enter.*" *United States v. Ayala*, 446 F. App'x 78, 80 (10th Cir. 2011) (citations omitted) (emphasis added). The court finds that there is no evidence that the

officer encouraged the dog to jump into the BMW. Thus, the court will focus its attention on whether the officer created the opening into the BMW.

In *United States v. Winningham,* the Tenth Circuit found that a dog's entry into the open sliding door of a van constituted a search of the vehicle when the detaining officer himself opened the passenger door before running the dog around the vehicle. 140 F.3d 1328, 1330–31 (10th Cir. 1998). In determining if the dog's actions constituted a search, the court focused on the officer's conduct—including what the officers did not do. *Id.* Specifically, the court noted that because "the officers themselves opened the door" and demonstrated a "desire to *facilitate* a dog sniff of the van's interior" that the dog's entry into the van constituted a search in violation of the Fourth Amendment because the officers lacked probable cause. *Id.* (emphasis in original). Since *Winningham*, this issue has only come up a handful of times in this jurisdiction.

Regarding the officers create an opening, the case law has not addressed situations where an officer indirectly creates an opening into the vehicle by ordering the driver to roll down the window—which is the case here. *See United States v. Lujan*, 398 F. App'x 347, 348 (10th Cir. 2010) (upholding the dog's entry into the vehicle because the defendant, without instruction, opened the passenger door and left it open as the dog sniffed around the vehicle); *see also United States v. Stone*, 866 F.2d 359, 364–65 (10th Cir. 1989) (upholding a dog's entry into a vehicle because the defendant voluntarily opened the hatchback); *United States v. Ayala*, 446 F. App'x 78, 79–80 (10th Cir. 2011) (upholding a dog's "intrusion with his nose into the [car's] driver's side window" because the "window was already partially down" when the officer approached the car). In the case at hand, the passenger windows were likely rolled down after the officers instructed the Defendants to do so. Additionally, the officers instructed Quintero to roll up the windows in English and never repeated the instruction in Spanish so that he could understand.

24

Thus, the court finds, that although the officers did not directly create the opening,[7] they indirectly created the opening into the vehicle by ordering the window down and not intelligibly instructing the windows to be rolled up. Indeed, their actions and omissions "*facilitate[d]* a dog sniff of the [car's] interior." *Winningham*, 140 F.3d at 1330–31 (emphasis in original).

For the foregoing reasons, the court concludes that the dog's entry into the car constituted a search under the Fourth Amendment and, therefore, must have been supported by probable cause.

### 2.   *Other Sources of Probable Cause*

Plaintiff argues that there are two other grounds—besides the dog alerting inside the BMW—upon which the officers had probable cause to search the vehicle. First, Plaintiff argues that the open container of alcohol inside the BMW gave the officers probable cause to search. Plaintiff cites to no case law to support this argument. The court, upon its own research, finds that the case law indicates that such a *per se* rule would violate the Fourth Amendment. *See United States v. Thomas*, 434 F. Supp. 3d 576, 585 (W.D. Ky. 2020), *recons. denied*, No. CV 3:19-CR-00024-JHM, 2020 WL 3511585 (W.D. Ky. June 29, 2020); *see also Florida v. Harris*, 568 U.S. 237, 244 (2013) (noting that the courts have "rejected rigid rules, bright-line tests, and mechanistic inquiries in favor of a more flexible, all-things-considered approach" when making probable cause determinations). Such *per se* rules are impermissible because they betray the test used to determine when probable cause exists—namely, that an officer has a reasonable belief that additional "contraband or evidence of a crime would be present." *Harris*, 568 U.S. at 243.

---

[7] This finding implies that indirectly creating the opening satisfies the first element recited in *United States v. Ayala*, 446 F. App'x 78, 80 (10th Cir. 2011).

Under this analysis, the court finds that the government has not shown that the officers reasonably believed the BMW would contain further evidence of an open container. In fact, an open container violation would typically not provide probable cause to search because an open container violation is self-contained—meaning the entirety of the violation is typically discovered upon finding the container. *See Thomas*, 434 F. Supp. 3d at 585 (finding that there was no probable cause to search based on an open container because "nothing suggest[ed] that there would be another container found"). Accordingly, the court finds that the open container did not provide probable cause to search the interior of the BMW.

This leaves Plaintiff's second argument that the officers had established probable cause to search the vehicle based on their drug investigation. In other words, Plaintiff argues that the same circumstances that gave the officers a reasonable suspicion to stop the vehicle also provided probable cause to search (*e.g.*, the moving of the bag and vehicles, the overdose, the inconsistent answers, Pena-Armenta's false name and attempt to get rid of the SIM card, and the dog indicating on the Ford). This argument fails for two reasons.

First, regarding the moving of the bag and vehicles, these circumstances do not provide probable cause because the standard for the automobile exception is that the officers must have a reasonable belief that the BMW contained "contraband or evidence of a crime." *Harris*, 568 U.S. at 243. Plaintiff has not made this showing. Without evidence that the officers had a reasonable belief that the BMW contained contraband or evidence of a crime then the government has failed its burden to justify the search. *See United States v. Perdue,* 8 F.3d 1455, 1462 (10th Cir. 1993). Second, the remaining facts Plaintiff points to as providing probable cause cannot possibly demonstrate probable cause to search because they all occurred after the K-9 alerted inside the car.

For the foregoing reasons, the court finds that the officer's violated Defendants' Fourth Amendment rights. Specifically, the court finds: (1) the officers had reasonable suspicion to stop the BMW; (2) the officers unreasonably prolonged the stop, leading to a *de facto* arrest without probable cause in violation of the Fourth Amendment; and (3) the dog's entry into the vehicle constituted a search without adequate probable cause in violation of the Fourth Amendment. Accordingly, the court finds that all statements obtained from Defendants after the K-9 entered the vehicle are excluded. Additionally, any evidence obtained from the BMW and Ford must be excluded as well. *See Wong Sun v. United States*, 371 U.S. 471, 485 (1963) ("The exclusionary rule has traditionally barred from trial physical, tangible materials obtained either during or as a direct result of an unlawful invasion."); *see also United States v. Jimenez*, 336 F. App'x 798, 802 (10th Cir. 2009) ("The poisonous tree doctrine allows a defendant to exclude evidence 'come by exploitation' of violations of his Fourth Amendment rights." (citation omitted)).

## II.   <u>Fifth Amendment Due Process</u>

Defendants argue that Agent Larson's interview during the transport violated the McDade-Murtha Act (28 U.S.C. § 530B) and, therefore, violated their Fifth Amendment rights to due process. Under the McDade-Murtha Act, "[a]n attorney for the Government shall be subject to State laws and rules, and local Federal court rules, governing attorneys in each State where such attorney engages in that attorney's duties, to the same extent and in the same manner as other attorneys in that State." 28 U.S.C. § 530B(a). Defendants argue that Agent Larson violated the McDade-Murtha Act by running afoul of Utah's "no-contact rule." Utah R. Prof'l Conduct 4.2(a).

Rule 4.2(a) states that "[i]n representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by a legal

professional in the matter, unless the lawyer has the consent of the legal professional." *Id.* While this rule and the McDade-Murtha Act apply to lawyers, they nevertheless can apply to law enforcement officials under some circumstances. *See United States v. Ryans*, 903 F.2d 731, 735 (10th Cir. 1990); *see also* Utah R. Prof'l Conduct Rule 4.2, cmt. 14. Utah's no-contact rule will not impute the actions of law enforcement officials to a lawyer "unless the conversation has been 'scripted' by the government lawyer." *United States v. Koerber*, 966 F. Supp. 2d 1207, 1226 (citing Utah R. Prof'l Conduct Rule 4.2, cmt. 14). In short, "Comment 14 effectively ties in to the 'alter ego' analysis—in certain circumstances enforcement officials are agents of the prosecuting party." *Id.* (quotation marks omitted) (collecting cases).

The court need not spend much time on this issue. In this instance, Defendants have not made any arguments that Agent Larson in any way coordinated, conspired, or otherwise communicated with the prosecutors before interviewing Defendants. The case that Defendants rely on[8] demonstrates that there must be some type of coordination, influence, authorization, or communication between the agent and the prosecutor. *See Koerber*, 966 F. Supp. 2d at 1227–29 (discussing that the government knew that the defendant was represented and still authorized and instructed agents to arrange and conduct interviews with the defendant). Since Defendants have not adduced any evidence that Agent Larson acted as the prosecutor's "alter ego," the court finds that there was no violation of the McDade-Murtha Act and, therefore, no violation of Defendant's Fifth Amendment rights under this theory.

---

[8] The court finds Defendants' attempt to rely upon *United States v. Thomas* unpersuasive because that case was concerned with the *attorney's conduct* in attempting to admit into evidence it knew was obtained in violation of the attorney client privilege. 474 F.2d 110 (10th Cir. 1973).

III.   **Fifth Amendment Right Against Self-Incrimination
       & Sixth Amendment Right to Counsel**

Defendants argue that Agent Larson violated their Fifth Amendment right against self-incrimination and their Sixth Amendment Right to counsel during the transport from Provo to their initial appearances. Defendants make three arguments about why these rights were violated: (A) Agent Larson deprived Defendants of the opportunity to receive assistance of counsel; (B) Agent Larson unlawfully elicited incriminating statements; and (C) Agent Larson obtained incriminating statements in the absence of a valid waiver.

**A.  Opportunity to Receive Assistance of Counsel**

Defendants argue that the officers "conduct[ed] themselves in such a way as to deprive a criminal defendant of the very opportunity to receive assistance." This argument overstates the facts in this case and the law regarding government conduct that interferes "with the ability of counsel to make independent decisions about how to conduct the defense." *Strickland v. Washington*, 466 U.S. 668, 685 (1984) (collecting cases). The factual situations where courts have found that government conduct interfered with the ability of a defendant to have a meaningful attorney-client relationship are not present here. The collection of cases from *Strickland* notes that this type of violation occurs, for example, where there is a: bar on attorney-client consultation during overnight recess; bar on summation at a bench trial; requirement that the defendant be the first defense witness; or bar on direct examination of a defendant. *See id.* (citations omitted). The government's conduct in this matter is entirely different from the cases where such interference has been found. Accordingly, the court finds this is not a sufficient argument to establish a Sixth or Fifth Amendment violation in this instance.

**B.  Unlawfully Eliciting Incriminating Statements**

Defendants argue that Agent Larson deliberately and unlawfully created a situation in which Defendants were likely to make incriminating statements to a co-defendant and the agents without counsel present. To support this argument, Defendants cite extensively from *United States v. Geittmann*, 733 F.2d 1419 (10th Cir. 1984). According to Defendants, *Geittmann* stands for the proposition that "once the right to counsel has attached, the defendant's own incriminating statements elicited surreptitiously by the police without counsel present may not constitutionally be used by the prosecution as evidence against him at his trial." *Id.* at 1425–26 (internal formatting and citation omitted). Defendants again attempt to situate this case among inapposite case law.

*Geittmann* focused its analysis on the facts of two Supreme Court cases: *United States v. Henry*, 447 U.S. 264 (1980) and *Massiah v. United States*, 377 U.S. 201 (964). In these cases, the government elicited incriminating, post-indictment statements by using a "co-defendant [who] decided to cooperate with the government" and a "paid government informant [who] was housed in the same cell block as [the defendant.]" *Geittmann*, 733 F.2d at 1426. Defendants suggest to the court that it is irrelevant that a co-defendant and a paid informant slash cellmate elicited the incriminating statements in *Henry* and *Massiah*. The court strongly disagrees. To read *Henry*, *Massiah*, and *Geittmann* in such a way is an indefensible interpretation of those cases. Indeed, the *Geittmann* opinion frequently reiterates that the Sixth Amendment violation came *precisely because of* the co-defendant and cellmate's identity and relationship with the defendants and the government. To be more specific, *Geittmann* focuses much of its analyses on the fact that *Massiah* dealt with a "*trusted* co-defendant" who was "secretly cooperating with the government" and that *Massiah* and *Henry* "condemn deliberate efforts by the government to

30

create situations in which indicted defendants are likely to make incriminating statements *to seemingly independent others* in the absence of counsel." *Id.* at 1426–27 (emphasis added). Such circumstances are not present here. Agent Larson is not seemingly independent nor is he in a unique position of trust with Defendants. There are also no allegations that there was some kind of plan or coordination to set up the transport in a way that deliberately and unlawfully created a situation in which Defendants were likely to make incriminating statements. In fact, it would be difficult to imagine how the court could find that Agent Larson surreptitiously elicited incriminating statements when he informed Defendants of their *Miranda* rights before transporting them to their initial appearance. Accordingly, this argument fails to prove a Sixth Amendment violation.

### C. Absence of A Valid Waiver

Defendants argue that Agent Larson violated Defendants Sixth and Fifth amendment rights by deciding to contact a represented party, post-indictment and in the absence of a valid waiver. Generally speaking, "[i]n the context of post-indictment interrogation, the sixth amendment right to counsel is similar to the fifth amendment right against self-incrimination as set forth in *Miranda*." *Geittmann*, 733 F.3d at 1426. Accordingly, the court will address the alleged Fifth and Sixth Amendment violations together. Thus, the question before the court is whether Defendants actually waived their rights before speaking to Agent Larson during the transport interview.

A *Miranda* waiver must be made "voluntarily, knowingly, and intelligently." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). The waiver inquiry has "two distinct dimensions":

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision

31

> to abandon it. Only if the totality of the circumstances surrounding the interrogation
> reveal both an uncoerced choice and the requisite level of comprehension may a
> court properly conclude that the *Miranda* rights have been waived.

*Id.* (citation omitted). In cases challenging a waiver of rights, "a heavy burden rests on the

government to demonstrate that the defendant knowingly and intelligently waived his privilege

against self-incrimination and his right to retained or appointed counsel." *Id*. In this case, the

court need not address whether any alleged waiver was coerced. There is no evidence or

allegation of coercion, intimidation, or deception. Thus, the issue is whether any waiver was

"made with a full awareness of both the nature of the right being abandoned and the

consequences of the decision to abandon it." *Burbine*, 475 U.S. at 421.

"The course of decisions since *Miranda*, informed by the application of *Miranda*

warnings in the whole course of law enforcement, demonstrate that waivers can be established

even absent formal or express statements of waiver that would be expected in, say, a judicial

hearing to determine if a guilty plea has been properly entered." *Berghuis v. Thompkins*, 560

U.S. 370, 383 (2010). In fact, "[n]othing in *Miranda* requires an officer to ask specifically if the

suspect waives his rights." *United States v. Varela*, 576 Fed. Appx. 771, 776 (10th Cir. 2014);

*see also North Carolina v. Butler*, 441 U.S. 369, 373 (1979) (noting that "the defendant's silence,

coupled with an understanding of his rights and a course of conduct indicating waiver").

Nonetheless, "[i]f the State establishes that a *Miranda* warning was given and the accused

made an uncoerced statement, this showing, standing alone, is insufficient to demonstrate 'a

valid waiver.'" *Berghuis*, 560 U.S. at 384. "The prosecution must make the additional showing

that the accused understood these rights." *Id.* "Where the prosecution shows that a *Miranda*

warning was given and that it was understood by the accused, an accused's uncoerced statement

establishes an implied waiver of the right to remain silent." *Id.* However, "[i]t has been pointed

out that courts indulge every reasonable presumption against waiver of fundamental

constitutional rights and that [courts] do not presume acquiescence in the loss of fundamental

rights. A waiver is ordinarily an intentional relinquishment or abandonment of a known right or

privilege." *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938) (citations omitted). "The determination

of whether there has been an intelligent waiver of right . . .  must depend, in each case, upon the

particular facts and circumstances surrounding that case, including the background, experience,

and conduct of the accused." *Id.*

In applying these principles, the Supreme Court in *Patterson v. Illinois* distilled the many

recitations about what it means to make a knowing and intelligent waiver into one "key inquiry":

"Was the accused, who waived his Sixth Amendment rights during postindictment questioning,

made sufficiently aware of his right to have counsel present during the questioning, and of the

possible consequences of a decision to forgo the aid of counsel?" 487 U.S. 285, 292–93 (1988).

The court then explained that the accused in that case was made aware of his rights and the

consequences of waiver for two reasons. "First, the *Miranda* warning given petitioner made him

aware of his right to have counsel present during the questioning." *Id.* at 293. This was sufficient

to inform the accused of "the sum and substance of the rights the Sixth Amendment provided

him." *Id.* "Second, the *Miranda* warnings also served to make petitioner aware of the

consequences of a decision by him to waive his Sixth Amendment Rights." *Id.* The court found

that the *Miranda* warnings were sufficient to make him aware of the consequences of a waiver

because the accused "[knew] what could be done with any statements he might make, and,

therefore, what benefit could be obtained by having the aid of counsel while making such

statements." *Id.* The law as stated in *Patterson* convinces the court that both Quintero and Pena-

Armenta did, in fact, make knowing and intelligent waivers.

At the outset, the court is unsure why Quintero has seemingly been left out of this portion of the briefing despite moving to suppress this evidence. The court, therefore, will treat any arguments as though they include both Defendants. With that in mind, Plaintiff argues that Defendants knowingly and intelligently waived their rights because they had a lengthy conversation about how Defendants were entitled to an attorney and how one could be provided. According to Plaintiff, this conversation was sufficient to make Defendants' waiver knowing and intelligent. In response, Defendants advance a single, conclusory argument that there was no "valid waiver" of their rights. (Def. Marysol Pena-Armenta's Mot. to Suppress Ev., at 31–2, ECF No. 99.) The court finds that the government has the better argument in this case.

It is clear from both the transcript and the audio of the transportation interview that Agent Larson informed Defendants of their Fifth and Sixth Amendment rights and that Defendants appreciated the consequences of continuing to speak to Agent Larson. First, Defendants were clearly made aware of their rights by Agent Larson. Agent Larson not only read the warnings to Quintero in Spanish but also confirmed Quintero understood his rights after each warning. Additionally, Pena-Armenta was given the warnings in English and understood them sufficiently to translate them into Spanish. Second, Defendants were made aware of the consequences of waiving their rights when Agent Larson told them that anything they say can be used against them. Quintero clearly understood these instructions as evidence by him later telling Pena-Armenta not to "joke around so much. . . because when I got on. . . [Agent Larson] told me that everything we say here, it could be used against us, that's why you don't just say things in jest." (Ex. G-1 at 22, lines 509–19; 23, line 558.) Regarding Pena-Armenta's understanding, there is no one point in the audio recording that the court can cite as a demonstration she understood the consequences of waiving her rights. However, it seems clear from the entirety of the

34

transportation interview that Pena-Armenta understood her rights and the consequences of continuing to speak to Agent Larson. Furthermore, a specific showing of understanding is not required. *Berghuis*, 560 U.S. at 385 ("[T]he law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford."). The evidence shows that Pena-Armenta comprehended her rights and then acted in a manner inconsistent with an individual who wished to exercise her rights against self-incrimination and to counsel. Accordingly, the court finds that Pena-Armenta made a knowing and intelligent waver of her Fifth and Sixth Amendment rights.

For the foregoing reasons, the court finds that the interview during the transportation did not violate Defendants' Fifth or Sixth Amendment rights under any of the theories advanced by Defendants. Because the court finds that there was no Fifth or Sixth Amendment violation, the court will deny Defendants' request that the court dismiss the indictment or exclude all statements or evidence seized as a result of the transportation interview.

### CONCLUSION

For the foregoing reasons: Defendant Quintero's Motion to Dismiss (ECF No. 60) is DENIED; Defendant Quintero's Motion to Suppress Statements and Evidence Derived as a Result of Violations of Sixth and Fifth Amendment Rights (ECF No. 61) is DENIED; Defendant Quintero's Motion to Suppress Evidence Derived as a Result of an Unlawful Search and Seizure (ECF No. 62) is GRANTED; Defendant Pena-Armenta's Motion to Suppress Evidence Derived as a Result of an Invalid Search and Seizure (ECF No. 52) is GRANTED; Defendant Pena-Armenta's Motion to Suppress Statements Derived in Violation of the Sixth and Fifth Amendment Rights (ECF No. 53) is DENIED; and Defendant Pena-Armenta's Motion to

Dismiss for Outrageous government Conduct or in the Alternative to Suppress Statements (ECF No. 55) is DENIED. The court declines to dismiss the indictment at this time. Plaintiff may pursue the charges against Defendants if it so chooses and to the extent the law so permits.

      The court FURTHER ORDERS that, within 14 days of receiving this Order, Plaintiff submit the amount of time remaining on Defendants' speedy trial clocks.

      DATED this 23d day of December, 2020.

                  BY THE COURT:

                  DALE A. KIMBALL
                  United States District Judge